**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GREGORY LEFFEW,

        Plaintiff,

v.                                  Case No. 06-CV-12202-DT

FORD MOTOR COMPANY, UNICARE LIFE
AND HEALTH INSURANCE PLAN, and FORD
NATIONAL RETIREMENT PLAN,

        Defendants.

                                           /

**ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT**
**AND**
**GRANTING DEFENDANTS' MOTIONS FOR JUDGMENT**

      Plaintiff Gregory Leffew filed his complaint against Defendants Ford Motor

Company, Ford National Retirement Plan (collectively "Ford") and Unicare Life and

Health Insurance Company ("Unicare") under the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff seeks long-term disability

benefits and retirement benefits under 29 U.S.C. § 1132(a)(1)(B), which the court will

consider in turn.

      Currently pending before the court are cross-motions for judgment. The court

has reviewed the motions and determined that a hearing on the matter is unnecessary.

*See* E.D. Mich. LR 7.1(e)(2). The court issues the following findings of fact and

conclusions of law, and for the reasons stated below, the court will grant Defendants'

motion and deny Plaintiff's motion.

## I.  STANDARD

Denial of benefits under an ERISA plan by the plan administrator is reviewed de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber, Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the plan provides the administrator with discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the court reviews that administrator's determination for arbitrariness or caprice. *Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 807 (6th Cir. 2002); *Miller v. Metro Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991).  Both sides have agreed that the arbitrary and capricious standard of review applies in this case.

Under the arbitrary and capricious standard of review, the court must determine whether the decision to deny Plaintiff benefits was rational and consistent with the terms of the plan.  *Miller*, 925 F.2d at 984; *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996).

> [T]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action.  When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.

*Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000) (internal citations and quotations omitted).  In other words, "when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious."  *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989).

## II. DISABILITY RETIREMENT BENEFITS

### A. Findings of Fact

1.  This action involves a claim under ERISA, 29 U.S.C. §§ 1001-1461, for review of a denial of disability retirement benefits.  (Compl. at ¶ 1.)

2.  Plaintiff was formerly employed by Ford as an hourly employee.  (AR at A0072.)

3.  While employed by Ford, Plaintiff was covered under the Ford Motor Company Employee Benefit Plan.  (*Id.* at A0076-A0111.)

4.  If eligible, Plaintiff was also able to participate in Ford's retirement disability plan.  (*Id.* at A0112-35.)

5.  To be eligible for retirement disability benefits, an employee must show

    > (i) that he is totally disabled by bodily injury or disease so as to be prevented thereby from engaging in any regular occupation or employment with the Company at the plan or plants where he has seniority and (ii) that such disability will be permanent and continuous during the remainder of his life.

    (*Id.* at A0157.)

6.  Under Ford's retirement disability plan, Ford is both the plan sponsor and the plan administrator.  (*Id.*)

7.  On June 2, 2003, Plaintiff called and requested an application for disability retirement from Ford.  (*Id.* at A0066.)

8.  During the conversation, Plaintiff told Ford that he had applied for disability benefits from the Social Security Administration ("SSA"), and that the SSA had not yet rendered a decision.  (*Id.*)

9.  Ford advised Plaintiff "to send in [a] copy of determination letter once [it was] received." (*Id.*)

10.   Ford received Plaintiff's completed application on December 29, 2003.  (*Id.* at A0064.)

11.   On January 15, 2004, Ford sent Plaintiff a letter directing him to take the enclosed medical form to his doctor for completion, and then call the Midwest Health Center to schedule an appointment.  (*Id.* at A0045.)

12.   Plaintiff saw Dr. Judy Macy who, in a February 10, 2004 report, concluded that a combination of Plaintiff's physical and psychiatric problems rendered Plaintiff totally and permanently disabled.  (*Id.* at A0019.)

13.   Dr. Maurice Castle, an orthopedic surgeon, conducted the first independent medical evaluation ("IME").  (*Id.* at A0018-20.)

14.   Dr. Castle reviewed Plaintiff's history, current medications, medical record, Dr. Macy's report and conducted his own physical examination, which included taking x-rays.  (*Id.*)

15.   In his March 1, 2004 evaluation, Dr. Castle concluded that "Mr. Leffew has objective evidence of pathology in his cervical and lumbar spine to give him some symptoms.  However, the findings are not of sufficient magnitude to declare him totally and permanently disabled."  (*Id.* at A0020.)

16.   Dr. Castle added that, although Plaintiff was "[n]ot totally and permanently disabled from an orthopedic standpoint," "[f]or an opinion of his psychological problems, a psychiatrist should be consulted."  (*Id.*)

17.   Based on Dr. Castle's evaluation, Christine Smith recommended that Plaintiff's application be denied.  (*Id.* at A0043.)

18.    Ford sent Plaintiff an April 30, 2004 letter denying his application for disability

retirement benefits because Plaintiff was not found to be totally and permanently

disabled.  (*Id.* at A0061.)

19.    After Plaintiff appealed, Ford instructed Plaintiff to schedule an independent

medical review with a psychiatrist at Midwest Health Center.  (*Id.* at A0042.)

20.    Dr. Edward Dorsey, a psychiatrist, interviewed Plaintiff and reviewed reports from

other doctors, including Dr. Nihal Saran who concluded that Plaintiff was totally

and permanently disabled.  (*Id.* at A0010-16.)

21.    In his August 5, 2004 IME, Dr. Dorsey stated that Plaintiff "did not appear

mentally ill today," and that Plaintiff's "fatigue, negative affects, and perhaps

significantly somatizing factors in the multifocal pain" can be attributed to "the

rising of cerebral strengths that the drugs and alcohol chemically suppress."  (*Id.*

at A0015-16.)

22.    Dr. Dorsey concluded that Plaintiff "is not permanently and totally disabled

psychiatrically according to the standards of the Ford Motor Company UAW

Retirement Plan."  (*Id.* at A0016.)

23.    Plaintiff informed Ford about his successful application for social security

disability benefits, but did not provide proof of the award when requested.  (*Id.* at

A0053, A0055.)

24.    Ford denied Plaintiff's appeal, and Plaintiff subsequently submitted a second

application for disability retirement, dated October 13, 2004.  (*Id.* at A0027-29.)

25.    On October 25, 2004, Ford directed Plaintiff to schedule an appointment for

another IME.  (*Id.* at A0026.)

26.   In a December 21, 2004 letter, Ford reminded Plaintiff that he had not yet scheduled an appointment, and warned Plaintiff that if he did not do so within thirty days, "we will consider your application cancelled."  (*Id*. at A0025.)

27.   Dr. Saul Forman examined Plaintiff and provided an IME on March 15, 2005.  (*Id*. at A0007-09.)

28.   In his IME, Dr. Forman mentions that he called Dr. Saran regarding Dr. Saran's diagnosis that Plaintiff was unable to work, and that Dr. Saran told him "I see no reason down the line why he can't return to work . . . he just started medication . . . he has not had mental health care in the past."  (*Id*. at A0009.)

29.   Dr. Forman opined that Plaintiff "very well may respond to medication," that "[t]here is a possibility of secondary gain in this gentleman," and while Plaintiff  "is disabled at this time, . . . he is not totally and permanently disabled.  This differs from a report that Dr. Saran wrote and submitted to the Ford Motor Company but I believe that my findings are more current."  (*Id*.)

30.   Dr. Forman also recommended that Plaintiff "be re-evaluated in six months to determine whether the disability will be total and permanent throughout the remainder of his life."  (*Id*.)

31.   On April 22, 2005, Ford sent Plaintiff a letter informing him that Ford denied his application for disability retirement benefits "because the medical evidence does not show that you are totally and permanently disabled within the meaning of Article IV, Section 3 of the Retirement Plan."  (*Id*. at A0006.)

## B.  Conclusions of Law and Application of Facts to the Law

The issue before the court is whether Ford's denial of Plaintiff's disability

retirement application was arbitrary and capricious.  Plaintiff asserts that Ford's decision

to deny him benefits was arbitrary and capricious for a number of reasons, which the

court will address below.

## 1.  Social Security Disability Award

Plaintiff first contends that Ford's decision was arbitrary and capricious because

Ford failed to provide its examiners with the SSA's findings and also failed to mention

these findings in its denial letters.  (Pl.'s Mot. at 11-14.)  Plaintiff submits that "nowhere

did the Ford Appeals administrator attempt reconcile [sic] how it was that a plaintiff was

totally but not permanently disabled in the view of the Social Security Administration's

findings but not in the claims process."  (*Id*. at 11-12.)  Plaintiff further claims that Ford's

failure to expressly consider the SSA's decision is especially significant because it

"required Mr. Leffew to apply for Social Security Disability benefits . . . . Once the SSA

findings were adverse to Ford, it simply ignored them."  (*Id.* at 13.)  Plaintiff contends

that "the SSA's findings work something like judicial estoppel."  (*Id.*)  Finally, Plaintiff

argues that because the Plan places the burden of proof on Plaintiff, Ford's "failure to

provide the unbiased findings of SSA to the decision makers violated his rights under

ERISA."  (Pl.'s Mot. at 12.)[1]

---

[1] Plaintiff also contends that Ford has conductive an inappropriate "selective review" under *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000), and *Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 362 (6th Cir. 2002).  (Pl.'s Mot. at 13-14.)  These cases, however, are inapplicable, because in both cases the Sixth Circuit reversed the defendant's denial due to the defendant's failure to provide reviewers with unfavorable *medical evidence* from *treating physicians*.  *See Williams*, 227 F.3d at 712; *Spangler*, 313 F.3d at 362.

7

It is clear that Plaintiff told Ford that he was awarded social security disability benefits, and nowhere does Ford dispute this fact.  (AR at A0053-55.)  Yet "the SSA's disability determination does not, standing alone, require the conclusion that [the defendant's] denial of benefits was arbitrary and capricious."  *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005).  Instead, the SSA award is "just one factor the Court should consider, in the context of the record as a whole, in determining whether [Defendant's] contrary decision was arbitrary and capricious."  *Id.*  Therefore, while a SSA determination is relevant, and should be considered in an ERISA disability benefits determination, "an ERISA plan administrator is not bound by a SSA disability determination when reviewing a claim for benefits under an ERISA plan."  *Whitaker v. Hartford Life and Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005).

It is clear that the plan did require Plaintiff to apply for social security disability benefits to offset the benefits paid by the Plan.  (AR at A0097, A0099, A0124.)  It is also clear, however, that *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516 (6th Cir. 2003), does not compel "the administrator to explicitly distinguish a favorable SSA determination when denying plan disability benefits," but instead simply "recognized a unique situation where it would be inconsistent for a plan administrator to *ignore* the SSA's favorable determination, after the administrator had expressly requested the claimant to apply for SSA benefits."  *Whitaker*, 404 F.3d at 949 (emphasis added); *see also Calvert*, 409 F.3d at 295 ("It is apparent, accordingly, that while *Darland* and *Ladd* counsel a certain skepticism of a plan administrator's decision-making on facts such as those at issue here, they do not stand for the proposition, urged by [the plaintiff], that a

8

plan administrator is conclusively estopped from disagreeing with an SSA award whenever the plan benefits from such an award.").

Moreover, it is unclear that Ford ignored the SSA's decision.  The Sixth Circuit has found unpersuasive the argument that a defendant's "silence with regard to the SSA record and findings is evidence that it did not consider them."  *Hurse v. Hartford Life and Accident Ins. Co.*, 77 F. App'x 310, 318 (6th Cir. 2003).  Furthermore, the Supreme Court holding in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), that the SSA's decision is only one factor for the court to consider "is also true when the insurer requires the insured to apply for social security disability benefits."  *Noland v. The Prudential Ins. Co. of Am.*, 187 F. App'x 447, 453-54 (6th Cir. 2006) (internal citations omitted).  The court agrees that the SSA's decision is relevant to Ford's benefits determination.  But because Ford has offered a "reasoned explanation, based on the evidence, for [its] outcome, that outcome is not arbitrary or capricious."  *Davis*, 887 F.2d at 693.

Finally, Plaintiff fails to propose how Ford could have provided its decision-makers with the SSA's findings when Plaintiff failed to submit proof of the award.  After Plaintiff told Ford about the SSA's determination, Ford repeatedly requested documentation substantiating his claim.  (AR at A0053.)  Plaintiff does not dispute that Ford requested, but never received, proof of Plaintiff's social security disability benefits award.  Because Plaintiff had the burden under the Plan to provide proof of his disability, Ford's decision not to rely on Plaintiff's unsupported claim that he was receiving social security disability benefits was neither arbitrary nor capricious.

9

## 2. Re-Evaluation

Plaintiff next claims that Ford's decision was arbitrary and capricious because they did not re-evaluate Plaintiff after six months as recommended by Dr. Forman.[2]  Dr. Forman, a psychiatrist, interviewed Plaintiff and submitted a March 15, 2005 psychiatric IME.  In his evaluation, Forman concluded that Plaintiff was "disabled at this time, but that he is not totally and permanently disabled."  (AR at A0009.)  Forman mentioned that he spoke to Dr. Saran, who concluded that Plaintiff was permanently disabled, and relayed Dr. Saran's opinion that he could "see no reason down the line why he can't return to work . . . he just started medication . . . he has not had mental health care in the past."  (*Id.*)  Forman recognized that his opinion differed from Dr. Saran's, but noted that his was more current.  (*Id.*)  Additionally, Forman suggested that Plaintiff be re-evaluated in six months to determine "whether the disability will be total and permanent throughout the remainder of his life."  (*Id.*)

Similarly, the plant physician concluded that Plaintiff's medical condition was not expected to be permanent and continuous.  (AR at A0022.)  The plant physician opined that Plaintiff was temporarily disabled, and suggested a re-evaluation in six months (in September 2005).  (*Id.*)  Plaintiff claims that "Ford's failure to follow its experts' recommendations and re-evaluate the medical evidence becomes even further

---

[2] Plaintiff attempts to bolster his disability claim by providing the court with documentation not provided in the administrative record.  (Pl.'s Ex. 2.)  "[I]n an ERISA claim contesting a denial of benefits, the district court is strictly limited to consideration of the information actually considered by the administrator."  *Killian v. Healthsource Provident Adm'r, Inc.*, 152 F.3d 514, 522 (6th Cir. 1998); *see also Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 615 (6th Cir. 1998); Court's Scheduling Order at 2.  Because the documents contained in Plaintiff's Exhibit 2 were not presented to the administrator, the court will not consider them.

evidence that Mr. Leffew did not receive a 'full and fair review' as mandated by ERISA."
(Pl.'s Mot. at 14.)

Ford's decision to forgo re-examination was not arbitrary and capricious.  Both
doctors who recommended re-examination still concluded that Plaintiff's disability was
temporary.  A doctor's conclusion that a re-examination would be helpful in evaluating a
patient is significantly different than a doctor's finding that he is unable to properly
evaluate a patient without that test.  Because the doctors merely indicated that a re-
examination would be helpful, and had no difficultly concluding that Plaintiff was only
temporarily disabled without the suggested follow-up examination, Ford's decision not to
wait for the re-examination was neither arbitrary nor capricious.

Furthermore, Plaintiff does not contest that it is his burden under the Plan to
demonstrate his disability.  Therefore, if Plaintiff believed that, in six months, his mental
condition would so deteriorate as to convince a doctor of its permanence, he was free to
re-submit an application at that time.

### 3.  Job Functions

Plaintiff next argues that "nowhere does Ford demonstrate that Mr. Leffew could
actually perform any job functions of any of the positions at Ford where he worked or
had seniority," which Plaintiff contends that Ford must do under the plan.  (Pl.'s Mot. at
16-17.)  The plan clearly states, however, that for an employee to be eligible for
retirement disability benefits, an employee must show:

> (i) that he is totally disabled by bodily injury or disease so as
> to be prevented thereby from engaging in any regular
> occupation or employment with the Company at the plan or
> plants where he has seniority *and* (ii) that such disability will
> be permanent and continuous during the remainder of his
> life.

11

(*Id.* at A0157 (emphasis added).)  Therefore, if Ford found that Plaintiff's disability was not permanent, then Plaintiff would not qualify as disabled under the plan, and Ford would not be required to consider Plaintiff's current ability to perform job functions.

Ford concluded that Plaintiff's disability was not permanent, and based its decision on the opinions of all three independent medical examiners.  Dr. Castle determined that Plaintiff was "[n]ot totally and permanently disabled from an orthopedic standpoint."  (AR at A0157.)  Dr. Dorsey concluded that Plaintiff "is not permanently and totally disabled psychiatrically according to the standards of the Ford Motor Company UAW Retirement Plan."  (*Id.* at A0016.)  Dr. Forman concurred, and opined that although Plaintiff "is disabled at this time, . . . he is not totally and permanently disabled."  (*Id.* at A0009.)

While these opinions differ from those of Drs. Macy and Saran, Plaintiff's treating physicians, "complete consensus is not required to establish a reasoned basis for an administrative decision."  *University of Cleveland v. Emerson*, 202 F.3d 839, 847 (6th Cir. 2000).  The court finds that Ford's decision to rely on three separate IME physicians' conclusions in finding that Plaintiff's disability was not permanent was neither arbitrary nor capricious.

### 4.  Conflict

Plaintiff also alleges that "Defendant Ford Retirement is operating under a structural conflict of interest as the sole decisionmaker and is funds [sic] the payment of benefits."  (Pl.'s Compl. at ¶ 32.)  "In considering such a conflict, there must be significant evidence in the record that the insurer was motivated by self-interest, and the plaintiff bears the burden to show that a significant conflict was present."  *Smith v.*

*Continental Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006).  In *Smith*, the court went on to

say that the plaintiff "did not develop the record to show that the conflict of interest

contributed to an arbitrary and capricious determination by [defendant].  Therefore, this

claim of error is without merit."  *Id.*

Here, in his motion for Judgment, Plaintiff concedes that "[a] review of the

Administrative Record in this case does not indicate that either company used its own

financial motive to deny Plaintiff's benefits, but rather, they have simply adopted a

cavalier approach in resolving claims.  Both Administrators did the minimum required of

them." (Pl.'s Mot. at 10.)  Plaintiff goes on to allege that "sloppy claims handling, and,

perhaps, a sort of listlessness creeped into the routine of these two entities such that

Mr. Leffew did not receive a 'full and fair review' as mandated by ERISA." (*Id.* at 10-11.)

Despite these statements, Plaintiff nonetheless asserts that "[s]ince Ford's Retirement

has a structural conflict of interest, the Court should more closely inspect Ford's

decision making process and weigh the conflict of interest as one factor in evaluating

the claim." (*Id.* at 11.)  The court finds that Plaintiff has shown no evidence that Ford's

decision to deny Plaintiff's disability retirement benefits was motivated by self-interest.

### III.  LONG-TERM DISABILITY BENEFITS

#### A.  Findings of Fact

1.      This action involves a claim under ERISA, 29 U.S.C. §§ 1001-1461, for review of
        a denial of long-term disability insurance benefits.  (Compl. at ¶ 1.)

2.      Plaintiff was formerly employed by Ford as an hourly employee.  (AR at A0072.)

3.      While employed by Ford, Plaintiff was covered under the Ford Motor Company
        Employee Benefit Plan.  (*Id.* at A0076-A0111.)

4.      Under the plan, an employee is entitled to 52 weeks of accident and sickness

benefits, and the employee may apply for extended disability benefits after he

has exhausted his accident and sickness benefits.  (*Id.* at A0096-0100.)

5.      According to the plan, an employee is

eligible for Extended Disability Benefits if:

•      You're covered for Accident and Sickness Benefits

•      Your disability continues beyond the period that you
were eligible for Accident and Sickness benefits and

•      You're totally disabled, which means:

–      You are not engaged in any regular occupation
or employment for remuneration or profit and

–      You are prevented by bodily injury or disease
from engaging in any regular occupation or
employment with the Company at the plant or
plants where you have seniority

(*Id.* at A0100)

6.      Plaintiff received accident and sickness benefits beginning July 23, 2001, and

exhausted the 52-week maximum eligibility period on September 2, 2002.  (*Id.* at

UNI 186.)

7.      On October 1, 2002, Unicare notified Plaintiff that he had been approved for

extended disability benefits effective September 3, 2002.  (*Id.* at UNI 188-89.)

8.      On November 27, 2002, Plaintiff called and advised Unicare that Dr. Gary

Conant, one of his treating physicians, released Plaintiff to return to work

effective December 2, 2002.  (*Id.* at UNI 019.)

14

9.     Dr. Macy, another treating physician, called Unicare on December 5, 2002, notifying them that she had seen Plaintiff on December 2, 2002, and that he was cleared to work effective December 9, 2002.  (*Id.* at UNI 019.)

10.    On January 13, 2003, Plaintiff called Unicare and told them that he had not returned to work in December and had therefore been fired.  (*Id.* at UNI 021.)

11.    Unicare advised Plaintiff multiple times that in light of the authorization from his treating physicians to return to work, Plaintiff would need to provide Unicare with updated medical information supporting his extended disability benefits; Unicare did not receive any medical documentation supporting a continuing disability beyond December 8, 2002.  (*Id.*)

12.    Plaintiff called Unicare on May 21, 2003, advising Unicare that he had been reinstated effective May 19, 2003, but that he had only worked fifteen minutes on that day due to pain in his neck and depression; Plaintiff has not returned to work since.  (*Id.* at UNI 025.)

13.    Under the plan, a reinstated employee must work at least four hours in one day before the employee is eligible for disability benefits.  (*Id.* at A0096.)

14.    Plaintiff submitted a new claim for accident and sickness benefits on May 29, 2003, in which Plaintiff claimed that his disability commenced on May 19, 2003. (*Id.* at UNI 158.)

15.    Unicare sent Plaintiff a June 9, 2003 letter denying his application on eligibility grounds because Plaintiff failed to work at least four hours since his reinstatement.  (*Id.* at UNI 025-26.)

16.    Despite language in the denial letter that notified Plaintiff of his right to appeal,

Plaintiff failed to file an appeal or otherwise exhaust his administrative remedies.

### B.  Conclusions of Law and Application of Facts to the Law

### 1.  December 2002 Application

### A.  Denial Letter

In his motion, Plaintiff contends that Unicare failed to send him an ERISA rights

letter when his long-term disability benefits were terminated.  (Pl.'s Mot. at 17.)  Plaintiff

notes that on January 23, 2003, Unicare's records show a denial letter with a notation

that "the below letter [sic] was not sent."  (AR at UNI 022.)  Plaintiff contends that

Defendant's failure to provide him with a denial letter violates 29 U.S.C. § 1133(1).[3]

*See also* 29 C.F.R. § 2560.503(b)(1).

"Unicare does not dispute that no letter was sent to Mr. Leffew following the

termination of his EDB."  (Unicare's Reply at 1.)  Unicare does, however, argue that

"taken in the context of the entire administrative record, the absence of such a letter

does not require that this Court enter judgment for Plaintiff or remand the matter back to

the claim administrator."  (*Id.*)  Unicare submits that because all of Plaintiff's treating

physicians told Unicare that Plaintiff was able to return to work by December 9, 2002,

and because Plaintiff provided no medical documentation controverting these medical

---

[3] Plaintiff also attempts to claim that Unicare's file contains no medical evidence.
(Pl.'s Mot. at 18-19.)  While it is true that Unicare took Plaintiff's treating physicians'
opinions over the phone, instead of requiring them to submit written reports, Unicare's
logs clearly show the content of each conversation.  (*See* AR at UNI 013-15, 020, 025.)
Furthermore, when the court considers that the administrative record contains no
indication of any medical evidence, written, oral, or otherwise, contradicting Plaintiff's
treating physician's oral opinions regarding his ability to return to work, the court finds
that Unicare's decision to accept medical evidence by phone was neither arbitrary nor
capricious.

16

opinions when requested, "the substantive basis for UniCare's decision cannot be attacked." (*Id.* at 3.)

First, the court recognizes that this claim against Unicare is procedural in nature. Plaintiff brings this procedural challenge against Unicare, despite the fact that no procedural challenge appears in the complaint, and Plaintiff submitted a "Statement of No Procedural Challenge." (Pl.'s Compl.; Pl.'s Statement.)  In his motion, Plaintiff attempts to argue that the wording of his statement of no procedural challenge "reserve[d] the right to challenge the claims handling of Unicare." (Pl.'s Mot. at 17 n.5.) The court disagrees.  The court's scheduling order specifically directs parties to "indicate whether the party views *the complaint* as asserting a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias, *and must indicate the precise nature of the procedural challenge.*" (Scheduling Order at 3 (emphasis added).)  After both Defendants submitted their statement of no procedural challenge, Plaintiff filed his statement, which "states that Plaintiff's Complaint challenges the decision and the decision making of the various benefits entities named as defendants." (Pl.'s Statement at 1.)  This general statement fails to clearly communicate that Plaintiff intends to bring a procedural challenge, and certainly fails to specify the precise nature of the challenge, especially in light of the title: "Plaintiff's Statement of No Procedural Challenge." (*Id.*)

Plaintiff also contends that his statement was appropriate because "Plaintiff maintains that discovery is not necessary for a resolution of this claim." (Pl.'s Mot. at 17 n.5.)  The scheduling order states that,

> *In the event there is such a procedural challenge, the dates for filing the Statement Regarding Standard of Review and Motions for Judgment set*

17

> *forth below shall be deemed adjourned*, and the court will provide a
> scheduling conference to consider the need for limited discovery, to set a
> discovery schedule, a motion cutoff date, and other dates.  Discovery is
> ordinarily limited to the procedural challenge indicated by the parties.  In
> the event that the parties dispute whether there is such a procedural
> challenge, the court shall set the matter for a hearing on the issue.

(Scheduling Order at 3.)  Because Plaintiff's failure to adequately alert the court and

Defendants to Plaintiff's procedural challenge deprived Defendants of the opportunity to

both (1) dispute whether there is a procedural challenge in this case, and (2) conduct

discovery themselves, the court finds that Plaintiff is precluded from bringing his

procedural challenge at this late stage in his motion for judgment.[4]

Plaintiff points to nothing in the complaint that gives notice to Defendants that

Plaintiff intended to bring a procedural challenge.  (*See* Pl.'s Compl.)  While the

"Federal Rules of Civil Procedure provide for a liberal system of notice pleading," the

Rules do require "'a short and plain statement of the claim' that will give the defendant

fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *E.E.O.C.*

*v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001) (citations omitted).  Here,

Plaintiff's complaint was insufficient to put the Defendants on notice that Plaintiff intended

to pursue a procedural challenge, as reflected in both the complaint itself and

Defendants' statements of no procedural challenge.  Furthermore, Plaintiff has also failed

to file a motion to amend his complaint to add a procedural challenge count; nor could

such motion be granted at this late stage in the litigation.  Accordingly, the court rejects

Plaintiff's attempt to insert an untimely procedural challenge.

---

[4] To the extent Plaintiff is submitting his Exhibit 3 in support of a procedural
challenge regarding Unicare's alleged failure to provide Plaintiff with his complete file,
the court declines to consider this claim for the same reasons articulated in footnote 2.

18

Even if the court were to consider Plaintiff's procedural challenge on the merits,[5] the court finds that Unicare substantially complied with 29 U.S.C. § 1133.  The Sixth Circuit has "recognized in ERISA cases that procedural violations entail substantive remedies only when some useful purpose would be served."  *Kent v. United Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir. 1996).  The *Kent* court determined that when the communications between the claimant and administrator, taken as a whole, fulfill the purposes of § 1133, "justice does not require, indeed it forbids, the reversal of a claim decision based on a technical defect."  *Id.*  Here, the administrative record shows that Unicare and Plaintiff were in constant communication regarding the status of Plaintiff's claim, Plaintiff's doctors' opinions regarding his ability to return to work, and Unicare requested numerous times that Plaintiff provide medical documentation supporting his claim.  (AR at UNI 021-25.)  Furthermore, Plaintiff has failed to explain what, if any harm Plaintiff suffered from the absence of an actual denial letter.  Accordingly, the court finds that remand is improper.

## 2.  May 2003 Application

Plaintiff submitted a new claim for accident and sickness benefits on May 29, 2003, in which Plaintiff claimed that his disability commenced on May 19, 2003.  (*Id.* at UNI 158.)  Unicare sent Plaintiff a June 9, 2003 letter denying his application on eligibility grounds because Plaintiff failed to work at least four hours since his reinstatement.  (*Id.* at UNI 025-26.)  Under the plan, a reinstated employee must work at

---

[5] The court rejects Unicare's argument that the court should dismiss Plaintiff's claim for his failure to exhaust his administrative remedies in light of Unicare's admitted failure to strictly comply with 29 U.S.C. § 1133.  *See Counts v. American Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 107 (11th Cir. 1997).

least four hours in the course of a day before the employee is eligible for disability benefits.  (*Id.* at A0096.)  Despite language in the denial letter that notified Plaintiff of his right to appeal, Plaintiff failed to file an appeal or otherwise exhaust his administrative remedies.

Plaintiff contests Unicare's denial of his May 2003 application on three bases. First, he argues that there is no four-hour work requirement that applies to Plaintiff's eligibility for benefits.  (Pl.'s Mot. at 19-20.)  Second, Plaintiff claims that Unicare never sent him a denial letter that cited this reason as the basis for its denial.  (*Id.* at 20.) Finally, Plaintiff submits that his May 2003 application was simply a continuation of his October 2002 disability, because his old "claim was never closed."  (*Id.* (citing AR at UNI 025).)

It is clear from the administrative record that Unicare did send Plaintiff a June 9, 2003 denial letter for his May 2003 claim.  (AR at UNI 025-26.)   The denial letter states the following reasons for Plaintiff's denial:

> Our records indicate that your employment was terminated with Ford Motor Company on December 9, 2002.  Based on the provisions of your disability benefits coverage, your eligibility for Accident and Sickness benefits remain in force through December 31, 2002 provided you filed a grievance.

> The medical evidence that you have supplied indicates that your disability began on November 22, 2002.[6]  Based on the above, your disability

---

[6] Unicare admits that this date is incorrect; it should have been in May 2003. (Unicare's Mot. at 13.)  To the extent Plaintiff asserts that an admittedly erroneous date somehow renders the denial letter invalid, the court finds this argument unpersuasive. Even though the denial letter gives the wrong date for when Plaintiff's disability began, the letter clearly states that Plaintiff's application was denied because Plaintiff did not have disability coverage on the date of his new disability.  (AR at UNI 026.)

coverage was not in force when you became disabled, due to no hour
worked on or after your reinstatement of May 19, 2003.

(*Id.* at UNI 026.)

Furthermore, Plaintiff had previously been terminated, and his earlier application
for long-term disability benefits had been denied.  Therefore, Plaintiff's May 2003
application for accident and sickness benefits, in which Plaintiff claimed that his
disability commenced on May 19, 2003, (id. at UNI 158), constituted a new claim, not a
continuation of his October 2002 claim.  Accordingly, this new accident and sickness
benefits application is subject to the four-hour "return to work" minimum.  (*Id.* at A0096.)
It is undisputed that, after reinstatement, Plaintiff worked only fifteen minutes on May
19, 2003.  (*Id.* at UNI 025.)  Therefore, under the plan, Plaintiff did not "return to work,"
and was therefore not eligible for disability benefits.  (*Id.* at A0096.)  Denying Plaintiff's
claim for disability benefits on that basis is neither arbitrary nor capricious.

## IV.  CONCLUSION

For the reasons stated above, IT IS ORDERED that Plaintiff's "Motion for
Judgment on the Administrative Record" [Dkt. #19] is DENIED and  Defendants'
motions for judgment [Dkt. ##25, 27] are GRANTED.

 S/Robert H. Cleland                                        
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  January 31, 2007

21

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, January 31, 2007, by electronic and/or ordinary mail.


 S/Lisa G. Wagner

Case Manager and Deputy Clerk

(313) 234-5522